IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 4, 2004 Session

**RHODNEY ROBERSON v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Gibson County**
**No. 14888-1     Joseph H. Walker, III, Judge**

_____

**No. W2003-01236-CCA-R3-PC - Filed July 8, 2004**

_____

The petitioner, Rhodney Roberson, appeals the Gibson County Circuit Court's denial of his petition for post-conviction relief from his conviction for first degree murder and resulting life sentence. The petitioner claims that he received the ineffective assistance of counsel because his attorney (1) failed to call an expert to testify; (2) failed to call other critical witnesses; (3) failed to request a severance from his codefendant wife at trial; and (4) used an unworkable trial strategy. We affirm the trial court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ, joined.

J. Barney Witherington, IV, Covington, Tennessee, for the appellant, Rhodney Roberson.

Michael E. Moore, Solicitor General; Jennifer L. Bledsoe, Assistant Attorney General; Garry G. Brown, District Attorney General; and Elaine Gwinn Todd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the death of the petitioner's stepdaughter, Tiffany McCaig. On August 30, 1994, the petitioner was convicted of first degree murder for the death of the victim but this court reversed his conviction and remanded the case for a new trial. In the petitioner's second trial, a jury again convicted the petitioner of first degree murder and this court affirmed the conviction. See State v. Roberson, 988 S.W.2d 690 (Tenn. Crim. App. 1998). On appeal, this court, referring to the petitioner and his wife as RR and CR, stated the following facts:

> At approximately noon on November 19, 1993, Dean Miller
> was summoned to the defendants' house in Gibson County. Miller
> worked for the Gibson County Emergency Medical Services. Upon

arriving at the house, he found Tiffany McCaig lying covered on the couch. Tiffany was CR's two-year-old daughter and RR's stepdaughter. Miller testified that Tiffany had been warm when he found her, and that he had noticed some bruising in her neck area. Because she had "no pulse, no respirations" when he found her, he immediately began administering CPR. After an ambulance arrived, he rode with the child to the hospital, continuing his CPR efforts. He was not successful, however, in reviving Tiffany.

Dr. O'Brien Clary Smith, the assistant medical examiner for Shelby County, performed the autopsy on Tiffany. He testified that she had had about twenty-two bruises in the head and face area and additional bruises on her neck, chest, left hip, and "the back and buttock region." He testified that these bruises had ranged in age from less than six hours to "about forty-eight to seventy-two hours" prior to her death. He further testified that the bruises had been inflicted "by anywhere from a moderate to a severe degree of force" during "at least four separate episodes" and that "a fist could [have] produce[d] these types of injuries." Additionally, he testified that, "It's my medical opinion that these bruises are most consistent with the child being struck as opposed to falling down." According to Dr. Smith, Tiffany died from peritonitis, "directly attributable to a tear in the portion of the intestine known as the duodenum." The tear, testified Dr. Smith, had been caused by "Massive blunt trauma--massive blunt force was applied to the abdomen with sufficient force to cause the intestine to tear. . . . [M]ost of the time these injuries of this type are seen with blows by a fist, a kick, or in a traffic accident they can be caused by a person slamming into the steering wheel when they're unrestrained. . . . Additionally, falls in the twenty to twenty-five foot range can--can cause this type of injury." Dr. Smith testified that he did not believe, in his medical opinion, that Tiffany's injury had been caused by a fall. He further testified that it was his medical opinion that the injury had occurred eighteen to thirty-six hours prior to her death, with his best estimate being twenty-four hours.

CR testified that she had seen RR treat Tiffany roughly on many occasions and that, on the evening of November 18, 1993, while RR was bathing Tiffany, she had heard "two thuds that sounded like a book dropping on the floor." After these thuds, she testified, she had heard Tiffany "grunt." She testified that RR had told her that he'd kicked his boots off, but that he had been wearing them when he came out of the bathroom. She further testified that, when Tiffany had come out of the bathroom, "She was staggering like she was drunk,

but she wasn't crying. She wasn't complaining." CR claimed that she had not known Tiffany was in danger on the night of November 18 and that she had not known she was severely injured. She also denied knowing how Tiffany had become severely injured.

Both CR and Mrs. W.I. Sherbit, RR's grandmother, testified that Tiffany had fallen across her stomach on the stone hearth during the afternoon of November 17, 1993. CR also testified that Tiffany had fallen once more that day.

Id. at 691-92.

At the post-conviction evidentiary hearing, the petitioner testified that his trial attorney only met with him one time for approximately thirty minutes before his second trial. He acknowledged that his attorney discussed ideas and strategies with him. He said, however, that his attorney did not investigate his claim that the victim's injuries occurred because his wife stepped on the victim. He said he talked with his attorney about severing his case from his wife's case and said he was prejudiced because his attorney ultimately decided not to request a severance. He said that although an expert testified favorably for him at a juvenile proceeding, his attorney never mentioned using an expert at trial. He said that he told his attorney that John Ketchum and Marcia Pennington would testify favorably for him but that these two potential witnesses told him that his attorney never contacted them. He said his attorney refused to let him testify. He also said his attorney knew that he was innocent.

On cross-examination, the petitioner acknowledged that he retained his attorney for his second trial after his attorney had represented him in his first trial and that his attorney had performed well in his first trial. He acknowledged that his attorney cross-examined the state's expert extensively about the time line for the victim's injury. He said his attorney also questioned his wife about the petitioner being home for only thirty to forty-five minutes before the victim began vomiting. He said his attorney was surprised when his wife's attorney blamed the petitioner for the victim's injuries. He said Mr. Ketchum would have testified about the petitioner's relationship with his wife and children. The petitioner said that if he had testified on his own behalf, he would have told the jury where he was when the victim was injured and that he did not hurt her. He said that he would have told the jury about his feelings and that he tried to give the victim medical attention. Although the state's expert testified that it was impossible, the petitioner said the victim kissed him and told him "Daddy go to work[]" on the morning that she died. He said his attorney told him not to testify because his wife and the state's expert had "cleared" him.

John Ketchum testified that he had known the petitioner for a long time and that he was ready to testify at the petitioner's trial but was never called. He said the petitioner was not rough with the victim and never mistreated her. He said that the day before the victim died, the petitioner was working at the Classic Body Shop. He said that the petitioner's wife beat the victim, that she was very rough with the victim, and that the petitioner had to tell his wife to stop beating the victim on

several occasions. He said the petitioner's wife told him that she knew the petitioner was innocent and could prove it but that she had to choose between herself and the petitioner at their trial. On cross-examination, Mr. Ketchum acknowledged that he never went to the police with his information. He said he talked with Mrs. Roberson's attorney about testifying but was told that he did not have any helpful information.

Marcia Pennington testified that she was Cynthia Roberson's mother, that she did not testify at the petitioner's second trial, and that the petitioner's attorney never contacted her. She said she never saw the petitioner beat the victim or mistreat her in any way. She also said the victim was accident prone. On cross-examination, she testified that her daughter's attorney did not call her to testify in the second trial because she did not have anything bad to say about the petitioner.

The petitioner's trial attorney testified that a bathtub incident involving the petitioner and the victim was important to the prosecution's case. He acknowledged that he did not call an expert to refute the state's expert's time line for when the victim was injured. He said he did not consult with an expert because he felt that the state's expert was beyond reproach. He acknowledged that the death certificate said that the date of the victim's injury was November 17, 1993, but that the bathtub incident happened on November 18, 1993. He said he did not introduce the death certificate into the record. He said that although the state introduced evidence of bruising to the victim, he did not present evidence to the jury to show that the victim's anemia could have caused the bruising. He said that even after Mrs. Roberson's attorney filed for a divorce, he did not realize that her attorney was going to blame the petitioner for the victim's death in the second trial. He said he did not request a severance but would have requested one if he had known that the wife's attorney was going to blame the petitioner. He said he did not remember the petitioner giving him a letter from his wife stating that her attorney was going to attack him on the bathtub incident. Although Mrs. Roberson admitted during a polygraph test that she accidentally "kneed" the victim, he did not recall if he cross-examined her about this statement. He said his defense theory was that the victim injured herself when she fell on a stone hearth. He acknowledged that part of the prosecution's strategy was to accuse the petitioner of beating his wife to show his propensity for violence. He said he never told the petitioner he could not testify but advised him not to testify because of his prior record and because he believed the petitioner would make a poor witness.

On cross-examination, the petitioner's trial attorney testified that he did not remember anything about Mr. Ketchum and that his testimony regarding the petitioner's relationship with his wife and children would have been cumulative. He said that he was uncomfortable calling Mrs. Pennington to testify because she was Mrs. Roberson's mother and that he was afraid that her testimony would not be favorable. In addition, he said the only benefit of her testimony would be to show that the petitioner called about the victim being ill and that she told him to give the victim Pepto-Bismol. He said he believed this testimony would have been cumulative. He acknowledged that Mrs. Roberson's attorney tricked him. He said that he believed the jury acted capriciously and with passion when they convicted the petitioner because the victim was a child. He acknowledged that Mrs. Roberson gave several statements indicating that she was the person in the bathroom with

the victim and only changed her version of how the victim was injured when she was told that her version was medically impossible. The trial court denied the petition for post-conviction relief.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201.

In a post-conviction case, the burden is on the petitioner to prove by clear and convincing evidence his grounds for relief. T.C.A. § 40-30-210(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

With regard to the petitioner's claim that his attorney was deficient for failing to call an expert to testify about the time of the victim's injury, the petitioner failed to present the testimony of a witness that would have testified as to when the victim's injuries occurred. Without any proof at the post-conviction hearing as to the testimony that a witness would have offered, the petitioner cannot demonstrate that he was prejudiced by the failure of the witness to be interviewed or called on his behalf. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

As to the petitioner's claim that his attorney should have called John Ketchum to testify, Mr. Ketchum testified that he only talked to Mrs. Roberson's attorney, not the petitioner's attorney. In addition, he said that he never talked to the police about his information regarding the petitioner and

his wife.  The petitioner's attorney testified that he did not remember hearing anything about Mr. Ketchum.  With regard to Mrs. Pennington, he testified that because she was Mrs. Roberson's mother, he was afraid her testimony may harm the petitioner.  In addition, he said that the benefit of her testimony, establishing that the petitioner sought medical help for the victim, was already in the record.  Thus, in addition to being uncertain, her testimony would have been cumulative.  The evidence does not show that the petitioner's attorney was deficient by failing to call Mr. Ketchum or Mrs. Pennington to testify.

With regard to his failure to request a severance, the petitioner's attorney testified that he believed that the petitioner and Mrs. Roberson were going to present a united front, as they did in their first trial, and argue that neither of them did anything to harm the victim and that they sought out medical help when they believed it was necessary.  He said he was surprised when Mrs. Roberson's attorney began to point the blame at the petitioner.  Although in retrospect the attorney recognized that it may have been wise to sever the petitioner's case, as noted above, we defer to the trial strategy of the petitioner's attorney at the time of the trial as long as the strategy is informed and based on adequate preparation.  See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201.  The trial court found that the attorney's representation was not deficient, and we agree with the court's conclusion.

Finally, with regard to the petitioner's claim that his attorney used an unworkable trial strategy, we conclude that the record supports the trial court's finding that the attorney's performance was not deficient.  The petitioner's attorney testified that his strategy was to show that the petitioner was not present during critical times when the prosecution's expert claimed the injury occurred.  He said the theory he presented to the jury was that the victim injured herself when she fell on a stone hearth.  He cross-examined both the prosecution's expert and Mrs. Roberson extensively at the trial to establish his argument.  We hold that the petitioner has failed to show that he received the ineffective assistance of counsel.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE

-6-